**MARR ENTERPRISES, INC., and Ben Paz, Plaintiffs-Appellants,**

v.

**LEWIS REFRIGERATION CO., Defendant-Appellee.**

No. 75–3359.

United States Court of Appeals, Ninth Circuit.

June 30, 1977.

Douglas M. Fryer, argued, Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for plaintiffs-appellants.

Arthur D. McGarry, argued, Bruce T. Rinker, Seattle, Wash., for defendant-appellee.

Before LUMBARD,* WRIGHT and ANDERSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Marr Enterprises, Inc. ("Marr"), an Oregon family corporation, operated the fishing vessel CARICA along the Oregon coast. In 1971, Marr decided to operate in Alaskan waters off Kodiak. Being unfamiliar with those fishing grounds, it entered into a "lease" of the CARICA on April 3, 1971 with Ben Paz, an Alaska citizen.

* Senior Circuit Judge for the Second Circuit.

On May 6 of that year, Marr contracted with Lewis Refrigeration Co. ("Lewis"), a Washington corporation, for installation of a $CO_2$ brine refrigeration system aboard the CARICA. The injection of $CO_2$ into brine to combat the growth of bacteria was an experimental part of the system. Paz was aware of the negotiations between Marr and Lewis but was not a party to the contract.

The refrigeration system did not work properly and was disconnected by Paz in January 1972. Thereafter he fished in the conventional manner, icing down the shrimp in the hold of the CARICA until it reached port.

Marr brought suit in district court in Western Washington for breach of contract and for negligence on the part of Lewis, alleging as damages miscellaneous costs of repair to the vessel, removal of the system, and payment for installation of the defective system. Paz joined in the suit against Lewis claiming lost fishing profits on account of Lewis' negligence.

On summary judgment motions, the trial judge dismissed all claims of Marr against Lewis except that for repayment of the purchase price, because the court found that contractual disclaimers of liability and limitations of remedy were valid and enforceable. Summary judgment was also granted against Paz, the court holding that Paz had no greater rights against Lewis than did Marr. After trial, judgment was entered on the breach of contract claim in favor of Marr for $12,500, the amount paid for installation of the system.[1]

Paz and Marr appeal the grants of summary judgment against them. We affirm.

I.

## THE MARR CLAIMS

A. *The Contract.*

The contract consisted of three typed and five printed pages. This language appears on the first typed page:

1. The total price was $25,000 but the contract had required only 50% down. Marr had paid only $12,500.

The responsibility and liability of Lewis Refrigeration Co. shall be limited to the mechanical integrity of the refrigeration system per se within the limits of its standard warranty as detailed in the contract documents.

It is further agreed and understood that the price stated for the system herein described is a consideration in limiting Lewis Refrigeration Company's liability. In the printed portion of the contract the following paragraph appeared in bold type as part of the standard warranty:

5. The warranties provided in Part B of this agreement and the obligations and liabilities of seller thereunder are the only warranties made by seller as to the equipment and seller makes no other warranties, by course of dealing, usage of trade or otherwise, express or implied, which extend beyond the description and warranties herein. It is agreed that said warranties are in lieu of and buyer hereby waives all other warranties, guaranties, conditions or liabilities, express or implied, arising by law or otherwise, including, but not limited to, any, warranty of merchantability or fitness under the Uniform Commercial Code, and any obligation of the seller with respect to consequential damages and whether or not occasioned by seller's negligence and shall not be extended, altered or varied except by a written instrument signed by seller and buyer; provided, that in the event this provision relieving seller from liability for its negligence should for any reason be held ineffective, the remainder of this paragraph B(5) shall remain in full force and effect.

By the terms of the contract, the seller warranted that the equipment would be mechanically free of defects in material or workmanship. In the event of breach of this warranty, the liability of the seller was limited to replacement of parts. If the seller did not replace the parts within a reasonable time, the purchaser's only remedy was to rescind the contract and receive any portion of the purchase price already paid.

All claims against the seller for damage to real or personal property, and for prospective profits resulting from a breach of any provisions of the contract were waived by the purchaser. The contract also provided that it would be interpreted, performed, and enforced in accordance with the provisions of the Washington Uniform Commercial Code.

### B. The Uniform Commercial Code (UCC).

As enacted in Washington, the UCC does allow variation by agreement of the express and implied warranties arising under it. Wash.Rev.Code § 62A.1–102(3) (1971). Section 62A.2–316 allows for express negation or limitation of warranties if the language mentions merchantability, is large and conspicuous, and the contract is commercial in nature. The contract in this case meets these criteria.

Remedies for breach can also be limited in accordance with sections 62A.2–718 & 2–719. Section 2–718 allows for liquidated damages which are reasonable in light of the anticipated harm and not so large as to be void as a penalty. Section 2–719 provides that remedies for breach of warranty may be limited except where circumstances cause an exclusive or limited remedy to fail of its essential purpose. It also permits the limitation or exclusion of consequential damages, unless such exclusion or limitation is unconscionable.

### C. Marr's Arguments.

Against this contractual and statutory backdrop Marr makes three arguments against the enforcement of the contractual limitation of liability:

(1) The contract failed of its essential purpose; [2]

(2) There was a repudiation of the contract;

---

[2] Marr also argues that because Lewis committed a material breach of the contract it is not entitled to rely on the provisions restricting Marr's right to sue for recovery of consequential damages. Marr entitled this "failure of consideration." We need add nothing beyond what was said by the district court on this issue. C.T. 153–54.

(3) The allegations of negligence are not subject to contractual limitation.

(1) *Essential Purpose.*

■ The UCC provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title." *Wash.Rev.Code* § 62A.2–719(2) (1976). Comment 1 to this provision explains the principle behind it:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

Limited remedies under the UCC have been held to fail of their essential purpose when defects in the goods are latent and not discoverable on reasonable inspection. *E. g., Neville Chemical Company v. Union Carbide Corp.*, 294 F.Supp. 649 (D.Pa.1968), *affirmed in part and vacated in part on other grounds,* 422 F.2d 1205 (3rd Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

Another line of cases holds the remedy as inadequate when the seller or other party required to provide the remedy, by inaction or its action, causes the remedy to fail. Typically, cases in this latter category are those in which the plaintiff's remedy was limited solely to repair or replacement of defective parts and the seller failed to replace or repair in a reasonably prompt and non-negligent manner. *E. g., Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (D.Ill.1970).

In our case, if the seller did not replace the defective parts, the purchaser was entitled to refund of the purchase price. Thus, mere failure to replace or repair would not cause the court to read in the general remedy provisions of the UCC as in the cases cited above.

Marr does direct our attention, however, to one case in which the contract provided for alternate remedies of repair or refund of the purchase price. *See Jorgensen Co. v. Mark Construction, Inc.*, 56 Haw. 466, 540 P.2d 978 (1975). There the court reversed and remanded a summary judgment determination, implying that it would be possible to find that a similar contractually limited remedy had failed of its essential purpose. In *Jorgensen*, however, the defects were alleged not to have been detectable until such a late time that under the totality of the circumstances the court felt a refund of the purchase price would have been totally inadequate.

The court in *Jorgensen* held that the record revealed the existence of genuine issues of material fact which, if resolved in appellant's favor, would entitle it to the array of remedies provided a buyer by the UCC. 540 P.2d at 988. The court did not identify these factual issues, however.

To obtain the relief it seeks, Marr must prove that the district court has overlooked a genuine issue of material fact or, alternatively, that it incorrectly decided that the remedy provided did not fail of its essential purpose as a matter of law. *See generally, Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59 (9th Cir. 1973). In our view it has done neither. There is no indication that the defect was latent. Rather, the system never worked properly. Under the totality of the circumstances we do not feel that the remedy provided was totally inadequate.

*(2) Repudiation.*

Lewis wrote to Marr on February 10, 1972 and offered to increase the capacity of the refrigeration unit from 25% of the contract requirement to 50% upon the payment of an additional $15,000. The district court found this letter in legal effect to be an election by Lewis not to exercise its option in the contract to modify the system (without extra cost to the buyer) to enable it to operate at its stated capacity and was therefore a material breach of the contract.

Marr claims that this letter was a repudiation of the contract and deprived Lewis of the right to assert the limitation of liability provisions in the contract. We disagree.

 Simply stated, because the doctrine of anticipatory repudiation is viewed as working harsh results, for its application there must be a "positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties." *Regional Enterprises, Inc. v. Teachers Insurance and Annuity Assoc. of America,* 352 F.2d 768, 775 (9th Cir. 1965); *McFerran v. Heroux,* 44 Wash.2d 631, 640, 269 P.2d 815, 821 (1954). Lewis' letter contained no such "positive statement."

*(3) Negligence.*

 Allegations of negligence may be subject to contractual limitation if the provision clearly expresses the intention to exclude liability for any and all harm caused. 6A Corbin, *Contracts* § 1472 (1972); *Fleming v. Stoddard Wendle Motor Co.,* 70 Wash.2d 465, 469, 423 P.2d 926 (1967).

 Nevertheless, Marr alleges that because his claims sound in tort and not contract, the contractual limitation should not apply. In support of his position he cites *JIG The Third Corp. v. Puritan Marine Ins.*

*Corp.,* 519 F.2d 171 (5th Cir. 1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). In essence *JIG* holds that where there is no mention of "negligence" or "tort" in the disclaimer, or if there is no disclaimer, then the law of torts will govern a tortious injury. But, where there is a disclaimer mentioning "negligence" or "tort", the law of contracts will govern.

The court in *JIG* specifically required that the contract mention "negligence," "tort," or cognates thereof for a seller's disclaimer of negligence to be enforced. 519 F.2d at 176. Measured against this standard, Lewis' provisions are enforceable. The contract expressly disclaims liability for negligence. We therefore hold that these limitations are enforceable against both the tort and contract claims of Marr.

D. *Paz' Claims.*

On February 4, 1975, the district court granted summary judgment in favor of Lewis as to all Marr's claims against Lewis except the contractually agreed upon return of the purchase price. At the same time the court asked the parties to submit additional memoranda on the issue of Lewis' liability to Paz based on the court's ruling on the Marr-Lewis summary judgment motion. Subsequently, on March 21, 1975, the court granted Lewis' motion, dismissing Paz' claims.

The district court was of the opinion that Paz bore a dual relationship to Marr of joint venturer and charterer, disabling him from asserting any claims against Lewis which Marr, by contract, was disabled from asserting. C.T. 122.[3] Noting that both Marr and Paz had an interest in the profitability of the CARICA, and that the installation of the refrigeration system was intended to enhance that profitability, the court

---

**3.** The district court was later unsure of the exact relationship between Paz and Marr but was steadfast in its ultimate decision to grant summary judgment for Lewis. This is illustrated in the district court's order denying appellant's motion for reconsideration where the court stated that "Paz should have no greater rights as against defendant than does plaintiff Marr irrespective of whether the relationship between Marr and Paz be that of owner/charterer; lessor/lessee; joint venturers or partners, and whether plaintiffs assert a claim in contract or in tort." C.T. 155.

found that Lewis' efforts to protect itself through the use of various exculpatory clauses "should not be frustrated by permitting Marr's joint venturer and charterer to assert those damages which Marr itself cannot assert."[4] In support of its ruling, the court stated that a general rule in admiralty is that a charterer may not recover in damages from one who negligently performs a contract with the owner of the vessel. The court cited *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).

Paz and Marr executed a handwritten agreement, entitled "Lease," which provided in part that the skipper and crew would provide the fuel and groceries and would be entitled to 50% of the gross to the boat. The boat owner would supply the nets, pay for boat maintenance, and be entitled to 50% of the gross. Paz, the skipper, would hire and fire the crew and could fish any grounds and markets he chose.[5]

Under admiralty law this agreement appears to be a *demise* or *bareboat charter.* The essential feature of the demise charter is that it places the possession, control and management of the vessel in the lessee. No formal language is necessary. *United States v. Shea,* 152 U.S. 178, 189, 14 S.Ct. 519, 38 L.Ed. 403 (1894).

Appellant argues that *Robins* should not control the outcome in this suit because a *demise,* rather than a *time,* charter is involved.[6] The distinction appellant seeks to make is novel. Although it has been noted by several courts, the precise issue has not yet been ruled on.[7] This case, however, is not the appropriate vehicle for such a ruling because we hold that, despite the outcome on that issue, Paz is precluded from recovering.

The basic difference between the demise charter and the time charter is that the former shifts possession and control from the owner to the charterer.[8] The

---

4. Clerk's Transcript at 122.

5. Because all technical elements of a joint venture do not appear present here, we shall assume, with appellant, that the lease was in fact a demise charter party. (Specifically we note that there was no explicit agreement to share losses. 2 S. Rowley, Partnership §§ 52.9–52.13 (2nd ed. 1960). *But see, Gleason v. Metropolitan Mortgage Co.,* 15 Wash.App. 481, 551 P.2d 147, 155–57 (1976). Direction of the vessel during the charter term also appeared to be in Paz' control rather than "joint.")

6. In a time charter, the owner's personnel manage the vessel and he usually supplies the crew. Possession and control of the ship remain in the original owner. The charterer has only the temporary right to have his goods loaded and conveyed. *See* T. Scrutton, *Charter Parties and Bills of Lading,* at 45–46 (18 ed. 1974); G. Gilmore and C. Black, *The Law of Admiralty* ch. IV (2nd ed. 1975).

 In *Robins* a time charterer sued a drydocker to recover damages for loss of use and profits arising from a delay in the release of the chartered vessel from drydock, the delay having been caused by the drydocker's negligent injury to the ship's propeller. Mr. Justice Holmes, after rejecting the notion that a recovery might be had under contract and third-party beneficiary principles, posed the question of the case as "whether the [charterers] had an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who know nothing of the charter." To that question the Court answered:

 "Their loss arose only through their contract with the owners . . . . [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. . . . The law does not spread its protection so far."

 275 U.S. at 308–09, 48 S.Ct. at 135 (citations omitted).

7. Mr. Justice Holmes pointed out in fashioning the rule of *Robins* that a demise charter was not involved and therefore the consequences of a property interest in the charterer need not be examined. *See also Federal Commerce & Navigation Co., Ltd. v. The M/V Marathonian,* 392 F.Supp. 908, 910 n.2 (S.D.N.Y.), *aff'd* 528 F.2d 907 (2nd Cir. 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976).

8. "The fact that the demise charter bears the same generic name as the time . . . [charter] . . . is likely to lead one into thinking of the demise as quite similar in practical use and legal import. . . . Nothing could be farther from the truth; a better approximation would be to say that the demise is linked to the time . . . [charter] only by an accident of nomenclature arising out of [the] past . . .

charterer becomes, in effect, the owner *pro hac vice*. Appellant's argument is that, because the negligent installation of the refrigeration system interfered not only with his *contractual* right to have goods loaded and conveyed (for which there is no recovery under *Robins*), but also with his *property* interest in the use of the vessel, he should be entitled to damages for loss of use as though he were the owner.

■ Notably, however, it is the *owner's* interest which is shifted. *See Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962) ([The demise] is therefore tantamount to . . . an outright *transfer* of ownership. (emphasis added)); *Reed v. Steamship Yaka*, 307 F.2d 203, 205 (3rd Cir. 1962), *rev'd on other grounds sub nom., Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) ([The demisee] *takes the owner's place* for the term of the demise. (emphasis added)). Because in this case the owner's interest was circumvented by the limitations of liability found in the contract with Lewis, it would be anomalous to say that Paz, who claims the owner's right to damages, should have greater rights against Lewis than did the owner of the vessel.

■ Those who have criticized the Court's holding in *Robins* have noted that, if there were no charter, "the owner who lost the vessel's use could recover for that loss . . . ."[9] This is not true in our case. Marr's right to sue was strictly limited. If Paz has any right to recover, it is one to recover from Marr whose primary obligation was to furnish a seaworthy vessel at the beginning of the charter. *See Work v. Leathers*, 97 U.S. 379, 24 L.Ed. 1012 (1898), G. Gilmore and C. Black, *The Law of Admiralty*, § 4–22 (2nd ed. 1975).

> The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another. . . . The demise charter is thus . . an instrument for vesting in one person most of the incidents of ownership in a capital asset of that business—the ship—while another retains the general ownership and the right of reversion."

This conclusion is further supported by examination of the relationship between Marr and Paz. Their agreement gave Paz the right to purchase the CARICA within one year of the "start of lease." The contract for installation was negotiated and executed after the "lease" was executed, although Paz apparently left matters concerning the Lewis contract to Marr. Thus Paz, although aware of the plan to install this experimental system, took no steps to protect himself against the system's malfunctioning. Lewis on the other hand, took every commercially reasonable step provided for by Washington law to protect itself against claims of the sort Paz now seeks to pursue. There is no evidence that Lewis knew of the charter party.

It is unlikely that Lewis would have entered into a contract, apparently to be performed for little or no profit, had it supposed that it could be held liable for lost profits after it had specifically agreed with Marr that such damages would not be available. Given Paz' readiness to accept the benefits of the Lewis-Marr contract, along with his knowledge of and acquiescence in the installation of the system, he may not now claim exemption from the contractual limitations of liability.

To allow Paz to recover under these circumstances would not only frustrate the commercially reasonable expectations of Lewis, but would severely undermine those provisions of the Uniform Commercial Code that allow a seller in a commercial setting to place reasonable restrictions on his liability for consequential damages. *Cf. Federal Commerce & Navigation Co., Ltd. v. The M/V Marathonian*, 528 F.2d 907, 908 (2nd Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976); White and Summers, *The Uniform Commercial Code*, 334–35 (1972).

G. Gilmore & C. Black, *The Law of Admiralty*, § 4–20 (2nd ed. 1975). *See also, id.* § 4–23 (The Charterer as Owner: Third Persons).

**9.** James, "Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal," 25 *Vanderbilt L.Rev.*, 43, 56 (1972).

The decision of the district court is affirmed.